Patricia A. Ricci
Plaintiff *in Propria Persona*
15 Brookdale Drive
Youngsville, NC 27596
(919) 757-3936
paricci111@gmail.com



**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
323 E. Chapel Hill Street, Durham, NC 27702

PATRICIA A. RICCI
PLAINTIFF,

v.                                                    CASE NO. 1:22 CV 889

DUKE UNIVERSITY
DEFENDANT.
_____/

# COMPLAINT FOR DISCRIMINATION, RETALIATION, AND PROHIBITED ACTIONS ON THE BASIS OF DISABILITY

Patricia Ricci ("plaintiff"), sues Duke University ("defendant") for violations of the Americans with Disabilities Act and the Americans with Disabilities Amendments Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. §12101, *et seq.*, for discrimination, retaliation, and prohibited actions taken on the basis of disability under the "regarded as" and "record of" prongs in violation of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendment Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. § 12101, *et seq.* Plaintiff petitions for declaratory and injunctive relief under Title I of the ADA as implemented under 29 CFR Part 1630, *et seq.*

## PARTIES

1.      The plaintiff resides in Youngsville, North Carolina at the address of 15 Brookdale Drive, for all times material to the facts giving rise to the complaint.

2.      The defendant is an "employer" within the definition of 42 U.S.C. 12111(5), with their principal place of business at 12 Moore Dr., Durham, North Carolina 27709 for all times material to the facts giving rise to the complaint.

## JURISDICTION AND VENUE

**3.**      This court has original and exclusive jurisdiction over the plaintiff's claims pursuant to 28 U.S.C. §1331, in that the matters in controversy are brought pursuant to Title I of the ADA and ADA-AA of 2008; 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "discrimination"; as implemented by 29 CFR Parts 1630.13(b) and 1630.14(b)(3), (c) and (d) as it pertains to adverse employment actions, employers and medical examinations and interventions.

**4.**      Venue is proper in this judicial district under 28 U.S.C. §1391 because the defendant does business in this judicial district and the acts complained of took place in this judicial district.

**5.**      The plaintiff timely filed a charge of discrimination against the defendant with the Equal Opportunity Employment Commission (EEOC) on or about the date of May 6, 2022.

**6.**      The plaintiff has exhausted all administrative remedies and obtained her right to sue letter from the EEOC within the ninety days preceding the date on which she commenced her original complaint against the defendant.

**7.**      A true and correct copy of the EEOC's right to sue letter is alleged and included as Exhibit A.

**8.**      The plaintiff has exhausted all administrative remedies available to her.

## PLAIN STATEMENT

Defendant discriminated and retaliated against plaintiff based upon disability. When the plaintiff objected, the defendant sought to impose non-job-related medical treatments and accommodations without first conducting an individualized assessment to determine if she was a direct threat.

## BACKGROUND

**9.**      Since 2021, the defendant adopted measures known collectively as its "Covid-19 Policy", which included requirements or accommodations that employees wear surgical masks, take experimental vaccines, practice isolation and segregation, submit to medical examinations, and disclose vital statistics as new conditions of employment.

**10.**      The defendant admits that its "Covid-19 Policy" is intended to prevent the spread of "Covid-19", which it describes as a deadly, contagious disease.

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 2 of 23

**11.** The policy rests on the assumption that every employee, the plaintiff included, has or could have this disease.

**12.** That is, the policy's underlying assumption is that all of its employees are simultaneously at risk and pose a risk to the health of all other employees.

**13.** No provision exists in the policy to establish through individualized assessment whether a particular employee poses any direct threat to the health of their co-workers.

**14.** The policy imposed mitigation measures developed by the Center for Disease Control and Prevention (CDC), largely recommended for an "over-65, immune-compromised" population.

**15.** The defendant's "Covid-19 Policy" imposed these measures upon <u>all of its workers</u> without considering the individualized medical assessment of each employee's health or whether the policies were appropriate for the working population.

**16.** Likewise, no provisions are in place which authorize the policy measures either by legal duty or by statute, thus the defendant's adoption of this policy is <u>voluntary</u>.

**17.** The defendant implemented a Covid-19 policy with no oversight given to provide the policy with any legal enforcement mechanism.

**18.** The Covid-19 policy also relies upon the <u>voluntary</u> compliance of employees waiving their rights to informed consent, to medical privacy, to refuse experimental medical treatments as well as refuse non-job-related medical inquiries or treatments.

**19.** A voluntary policy is not a legitimate requirement and cannot trigger compulsory termination.

**20.** One of the mitigation measures established by the defendant's "Covid-19 Policy" is a vaccination mandate.

**21.** On the basis of compliance with this accommodation, the defendant's policy identified three types of employees: (1) vaccinated; (2) unvaccinated but with a medical or religious exemption; and (3) unvaccinated with no request for exemption.

**22.** The defendant's policy treated the second and third groups of employees (as opposed to the other employees that complied with the "Covid-19 Policy") either "as if" they carried a specific, active, infectious disease, or "as if" they had an impaired or suppressed immune system that made them prone to contracting "Covid-19".

**23.** The policy regarded them as disabled with a contagious disease with an impaired immune system.

3 of 23

**24.** It should also be noted that the policy fails to provide any provisions or guidance for employers to remain compliant with the ADA when they started implementing the new "Covid-19 Policy". This is a major flaw of the "Covid-19 Policy" and one which this case seeks to redress.

**25.** The policy has no provisions or guidance that instructs the employer on the practice of conducting an individualized assessment1 once an employee refuses any of the accommodations offered by the policy (such as mask-wearing, testing, or experimental vaccinations).

**26.** The policy fails to outline the process for an employer to follow if it wants to claim an exemption to its duties under the ADA.

**27.** The policy fails to provide guidance on the manner in which defendant could establish, by financial records, that it would suffer an undue financial burden for an employee's refusal, and it fails to provide guidance on how the plaintiff would document that an employee's refusal would fundamentally alter defendant's normal operations.

**28.** The policy fails to describe how any provision of the policy is directly related to any single employee's essential job function.

**29.** The policy also fails to provide guidance on how to give adequate notice to employees as to the manner in which the policy is directly related to the essential job function of any employee, including the plaintiff.

**30.** The policy failed to include guidance on how to process employees exceptions to the policy under the ADA.

**31.** The plaintiff is not limited only to the two "accommodations" defendant refers to as a "religious exemption" or a "medical exemption".

**32.** The "accommodations" of religious or medical exemptions fail to meet the statutory requirements of ADA compliant accommodations as defined in 29 CFR Part 1630.2(o) because the "exemptions" offered are not job-related adjustments to the workplace environment.

**33.** Any employee may refuse any accommodation under 29 CFR Part 1630.9(d) if the defendant does not have a *bona fide* exemption or exception from its legal duties under the ADA.

---

[1]29 CFR 1630.2(r) Individualized assessment shall include determining whether an individual would pose a direct threat, the factors to be considered include: the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the potential harm.

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 4 of 23

**34.** The plaintiff may refuse any or all accommodations regarding the "Covid-19 Policy" because the policy is not related to her essential job function which is the reason the job exists.

**35.** The policy also asked representatives of the defendant to make repeated, non-job-related medical inquiries of employees and to impose non-job-related medical treatments on them. It has no provisions for protecting the medical privacy of employees, and specifically the plaintiff's.

**36.** Medical decisions are far beyond the scope of the employer-employee relationship.

**37.** The plaintiff took exception to the policy partly because the practices were unrelated to the performance of her essential job functions2.

**38.** The policy, as mentioned previously, lacked enforceability, which did not allow employees to make their own medical decisions.

**39.** The defendant chose to adopt and implement its "Covid-19 Policy" through obfuscation, coercion, retaliation and interference specifically towards the "unvaccinated" employees, such as the plaintiff.

**40.** The plaintiff, as a qualified individual, exercised her right under the ADA to refuse the accommodations imposed by the "Covid-19 Policy".

**41.** The plaintiff gave notice that the policy discriminated against her by perceiving her as having an un-assessed disability, the defendant denied her equal access to the premises and continued to impose these unrequested accommodations.

**42.** The defendant also retaliated against the plaintiff by interfering with her rights, imposing punitive measures including requiring non-job related and hard to get medical examinations to exempt her from the policy, harassing her about her vaccination status, threatening her with termination, and ultimately terminating her employment which was directly and proximately caused by her good faith refusal to participate in the defendant's "Covid-19 Policy".

## STATEMENTS OF FACT

**43.** Plaintiff was employed as a senior IT analyst at Duke University from approximately June 1, 2008, until her termination on December 29, 2021.

---

[2] 29 CFR 1630.2(n)(2) definition "Essential Function": "(i) ….the reason the position exists is to perform that function."

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 5 of 23

**44.**     The plaintiff's duties included quality assurance, regulation, quality system documentation creation and maintenance, vendor audits, risk assessments related to GxP, budgeting, project management, and assisting clinical research.

**45.**     Plaintiff also oversaw internal audits, computer system validations and day to day activities related to the Duke Health Technology Solutions (DHTS) departmental Quality System at Duke University Health System.

**46.**     On July 23, 2021, Kyle Cavanaugh, Carol Epling, M.D., et al. sent plaintiff an email which stated that the plaintiff would be required to either get the "Covid-19" vaccination or obtain a medical or religious exemption by September 21, 2021.

**47.**     Prior to July 23, 2021, "Covid-19" vaccines were voluntary, however, Duke Office of Health and Wellness was sending emails out stating they did not have her vaccine status and recommending places for her to obtain a "Covid-19" vaccine.

**48.**     Shortly thereafter, plaintiff provided Duke University with an Exemption Request for the "Covid-19" vaccination and received notification that the exemption was accepted on July, 28, 2021.

**49.**     Since August 2021, plaintiff received weekly emails regarding her "unvaccinated" status; information about vaccines; surveillance testing, and daily symptom monitoring.

**50.**     Additionally, plaintiff received text messages twice a week about "Covid-19" testing.

**51.**     Followup emails and text messages were sent if she had not completed the testing for that week.

**52.**     On September 22, 2021, plaintiff received an email from the Duke Employee Office of Health and Wellness stating that, as of the week before, their records indicated that she was not fully vaccinated.

**53.**     The September 22, 2021 email also stated that any Duke University faculty or staff member not fully vaccinated with an approved exemption was required complete weekly surveillance testing and daily symptom monitoring beginning the week of October 4, 2021.

**54.**     On or about September 22, 2021, the plaintiff realized her employer was classifying her as "unvaccinated" regarding her as potentially having an infectious disease.

**55.**     On October 12, 2021, HR Director Claire Boland informed plaintiff that as of October 1, 2021, Duke University School of Medicine was testing for "Covid-19" contrary to her previously stating that the plaintiff did not have to test.

**56.**     Ms. Boland stated that the plaintiff was subject to the "covid-19" testing requirement.

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 6 of 23

**57.** During the conversation Ms. Boland stated she would look into who could determine whether it was really necessary for a remote employee (working from home), like plaintiff, be subject to testing and surveillance monitoring.

**58.** The plaintiff had not been onsite at a Duke Facility on since March 2019 (with the exception of two fifteen-minute visits to retrieve personal effects from her former desk in June, 2019.

**59.** The plaintiff was a remote employee (working from home) with no contact or physical interaction with other Duke Employees.

**60.** During this time, plaintiff had no other method of income and was forced to test at a local CVS in order to keep her job.

**61.** The plaintiff was also forced to take time off given stress is a trigger for a medical condition she suffers from.

**62.** On October 18, 2021, plaintiff spoke with Katy Boyd from Staff and Labor Relations regarding Weekly Surveillance Testing and Daily Symptom Monitoring given the fact that she was a 100% remote (working from home) employee.

**63.** During the call with Ms. Boyd, the plaintiff was informed that Duke had decided that regardless of location and risk factors involved, all staff and faculty in the Duke University School of Medicine not fully vaccinated required weekly "Covid-19" testing and daily symptom monitoring.

**64.** Plaintiff pointed out that requiring her to go to the Duke University campus for weekly testing was now putting her at risk, which was counterproductive.

**65.** Ms. Boyd's response evidenced the fact that the health measures imposed by defendant were completely unrelated to the plaintiff's job functions and its "Covid-19 Policy" was completely oblivious and indifferent to the reality of plaintiff's working conditions.

**66.** On October 18, 2021, plaintiff extended her paid time-off from October 18 through November 5, 2021, because the stress and the discrimination were causing her issues concerning her eye condition as stress is a big factor in plaintiff's illness.

**67.** On November 4, 2021, Katy Boyd tried to get plaintiff to file for a medical exemption to "Covid-19" testing.

**68.** The plaintiff discovered that no doctor would provide plaintiff with an exemption notice for testing for "Covid-19".

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 7 of 23

**69.**     On December 7, 2021, plaintiff was invited to a last minute meeting with Lee Mewshaw, manager and HR Director Claire Boland where she was told she had until December 15, 2021 at 10 AM to complete a "Covid-19" test.

**70.**     On December 7, 2021, the plaintiff was then placed on paid administrative leave and her access to her work servers was shut off.

**71.**     The plaintiff was given a Final Written Warning on December 7, 2021.

**72.**     On December 29, 2021, plaintiff had a conference call with her manager Lee Mewshaw and HR Director Claire Boland, where she was pointedly asked if she had changed her mind about the vaccine or the testing, suggesting that if she had she could keep her job, otherwise, she was terminated.

**73.**     Plaintiff informed them that she was not changing her mind about her religious beliefs, at which point she was fired.

**74.**     Mr. Mewshaw and Ms. Boland then provided her termination letter via her personal email stating plaintiff had gone against Duke's safety policy by not being vaccinated nor completing surveillance testing on a weekly basis.

**75.**     This occurred despite plaintiff being a 100% remote (working from home) employee with no interactions with anyone at Duke.

**76.**     A true and correct copy of all written communications are attached in Exhibit A.

## COUNT I. COMPLAINT FOR DISCRIMINATION IN VIOLATION OF THE ADA AS AMENDED

**77.** Plaintiff re-alleges each of the foregoing statements and those in her affidavit, and incorporates each herein and further alleges that this is a case of first impressions.

**78.** The defendant is a covered entity as defined under 42 U.S.C. §12111(5) of the ADA.

**79.** Disability cases typically involve plaintiffs who have assumed the burden of proof under the "actual" or "diagnosed" prong of the ADA; whereaxs, the plaintiff is proceeding under both the "regarded as" and the "record of" prongs of the ADA where the burden of proof is upon the defendant to prove that it qualified for an exemption or exception to their legal duties to comply with the ADA. These are further expressed in this complaint.

**80.** The plaintiff belongs to a minority of employees claiming to being regarded as having a disability by the "Covid-19 Policy".

**81.** The plaintiff was obviously qualified for a job she was already doing, and she was willing to the job.

**82.** Despite the plaintiff's qualifications, the plaintiff was denied equal access and was terminated.

**83.** The defendant's implementation of the "Covid-19 Policy" was a direct and proximate cause of the defendant's decision to terminate plaintiff's employment.

**84.** There was no other reason to terminate plaintiff's employment.

**85.** This is a case of "first impression" because the plaintiff has exercised her rights to medical privacy and informed consent to refuse the "Covid-19 Policy's" medical treatments. These rights are not limited merely to the "doctor-patient" relationship but are squarely rooted in the ADA under 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b), and 1630.14(c) and (d) for the reason that these rights are intangible private property rights of people, and of the plaintiff specifically, and are protected by law and are not originated or granted by any statute.

**86.** These rights existed long before any laws were adopted by modern society and in fact, have been exercised in the formation of modern society.

**87.** The defendant has failed to show how it's "Covid-19 Policy" which is not authorized by any statute overcame established rights that form the bedrock of modern society.

**88.** This is also a case of "first impression" because the plaintiff, in using the ADA to protect her rights, has asked the question: how did the defendant suddenly acquire a new legal authority or legal duty

Case 1:22-cv-00889-CCE-JEP Document 1 Filed 10/19/22 Page 9 of 23

to treat the plaintiff, its employee, for a disease without any medical examination or diagnosis? The answer of course is that the defendant never did acquire any such legal duty or authority.

89.     This is also a case of "first impression" because, while the defendant makes the noble-sounding but disingenuous claim that their "Covid-19 Policy" is intended to prevent the spread of "Covid-19", it has absolutely no financial responsibility to engage in or administer such a policy.

90.     In fact, employers may adopt a "Covid-19 Policy" for the entirely ulterior motive of qualifying for the government's disaster relief funds.

91.     (1) The defendant has not provided proof of any financial responsibility (insurance, etc.) to compensate anyone for becoming infected with "Covid-19" after complying with their "Covid-19 Policy".

92.     The defendant has not provided proof of any financial responsibility (insurance, etc.) to compensate anyone for suffering any adverse health consequences as a result of complying with its "Covid-19 Policy".

93.     This is additionally a case of "first impression" because, if the defendant actually had the novel and *bona fide* legal right to require the plaintiff to disclose her medical records, then the defendant would have the right to simply obtain the name and address of the plaintiff's physician and request such records directly from the physician.

94.     It is well-established that no physician would make such disclosure without the express written permission of the patient (plaintiff) or without a *bona fide* court order.

95.     The defendant's "Covid-19 Policy" is a failed policy because it does not include several necessary provisions.

96.     It has no provisions for remaining compliant with disability law or addressing the needs of employees with disabilities.

97.     It has no provisions for protecting the medical privacy of employees, and specifically the plaintiff's.

98.     It lacks any authorized enforcement provisions and relies either on the plaintiff to voluntarily waive her rights to medical privacy, informed consent, and rights protected under the ADA **or** upon the defendant's willingness to force submission to the policy in exchange for disaster funding.

**99.** The "Covid-19" policy fails to provide any advice or instruction on how to conduct any individualized assessment[3].

**100.** For those employees claiming rights under the ADA, the policy fails to identify that an ADA representative of the defendant will be necessary to oversee that the policy remains in compliance.

**101.** In fact, the defendant's "Covid-19 Policy" completely ignores all legal duties to aid and encourage those with disabilities under the ADA.

**102.** The defendant's "Covid-19 Policy" is applied in a discriminatory fashion by identifying distinct groups of employees, such as those who are "vaccinated" and those who are "unvaccinated" and treating them differently.

**103.** The policy identifies one group of employees who claim to be exempted from the policy for medical or religious reasons but ignores the group of employees who invoke their rights under the ADA and are in a protected class.

**104.** The defendant presumes that it "somehow" acquired the legal duty and legal authority to cure or treat the un-assessed disability by imposing the policy measures upon the plaintiff.

**105.** The defendant claims that its "Covid-19 Policy" is a legitimate requirement, which authorizes termination for non-compliance, yet the defendant fails to act under any legal authority or legal duty to impose its policy measures on employees.

**106.** Simply claiming that a policy is "mandatory" or "required" does not automatically make it compulsory or legitimate.

**107.** The plaintiff is regarded as having a disability by the defendant's "Covid-19 Policy", which, according to the defendant, was intended to prevent the spread of the contagious disease known as "Covid-19".

**108.** Although the plaintiff is not required by law to discuss the nature of an un-assessed disability she was assumed to have, for clarity's sake she alleges that the defendant's policy rested on the assumption that every employee, the plaintiff included, had or could have this disease.

**109.** That is, the "Covid-19 policy's" underlying assumption was that all of its employees were simultaneously at risk and also posed a risk to the health of all other employees.

---

[3] 29 CFR 1630.2(r) Individualized assessment shall include determining whether an individual would pose a direct threat, the factors to be considered include: the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the potential harm.

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 11 of 23

**110.**     It is undisputed that the defendant openly admitted that the purpose of such policy was the prevention of the spread of "Covid-19".

**111.**     The defendant's "Covid-19 Policy" regarded the plaintiff as having "Covid-19" or being prone to getting infected with "Covid-19" with all mitigation measures flowing from this premise; but the defendant terminated the plaintiff specifically for not being "vaccinated".

**112.**     It is not necessary to allege that the defendant's agents personally regarded the plaintiff as having a disability, the defendant's "Covid-19 Policy" clearly demonstrates that the defendant sought to impose the policy's provisions upon the plaintiff based upon the pure speculation, stereotype and generalization that she was infected or may in the future become infected with a deadly, contagious disease (e.g. "Covid-19").

### NON-JOB RELATED MEDICAL INQUIRIES

**113.**     The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

**114.**     The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b).

**115.**     The defendant's "Covid-19 Policy" imposed certain non-job-related medical inquiries ("accommodations") on the plaintiff including, but not limited to: disclosing private medical records and medical history; and disclosing vital statistics, like body temperature, which are a diagnostic tool of physicians but are not a diagnosis in and of themselves.

**116.**     The defendant's "Covid-19 Policy" imposed submitting to medical tests[4] which are a diagnostic tool of physicians but are not a diagnosis in and of themselves. This practice results in the absurd situation of relying upon a lay-man's "self-diagnosis" based upon interpreting one piece of data rather than upon a physician's professional finding.

**117.**     The defendant also assumes that its policy was the proper treatment to mitigate the effects of "Covid-19" in the workplace.

---

[4]"Covid-19 testing" results does not verify a diagnosis of being infected with "Covid-19", the test it is designed to detect the presence of a coronavirus, of which there are many, including the common cold. The tests also give many false positives when they are were not set to correct cycling according to instructions.

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 12 of 23

**118.** The defendant's "Covid-19 Policy" imposed certain non-job-related medical treatments including, but not limited to taking experimental vaccines; wearing a surgical mask over the face; engaging in "social distancing" which is a euphemism for quarantine and isolation.

**119.** These medical treatments and medical inquiries are beyond the scope of the employee-employer relationship (contract) when they are non-job-related; in addition, the defendant is trespassing on the plaintiff's medical privacy rights, both of these issues are expressed in the ADA.

**120.** The defendant has not provided proof that Covid-19 vaccine prevents infection and transmission of a disease as defined by modern scientific standards

**121.** The defendant has not provided proof that the Covid-19 vaccine would prevent anyone other than the plaintiff from becoming ill from Covid-19.

**122.** A vaccine protects the person taking it, and there is absolutely no scientific standard where any vaccine is taken to protect anyone else but the person taking it.

**123.** The "Covid-19 vaccines" demanded by the defendant are experimental because the policy was adopted during the Emergency Use Authorization (EUA) period and none of these experimental vaccines have been approved by the Food and Drug Administration, they have only been "authorized" for emergency use which means they are in clinical trial phase.

**124.** The only "Covid-19 vaccine" that is FDA-approved, Comirnaty, is not commercially available, should the plaintiff choose to take it.

**125.** The "Covid-19 Policy" as implemented by the defendant allowed un-skilled and unlicensed individuals to impose medical interventions upon employees because commentary on a website stated that such interventions might prevent a disease, even when these very websites disclaim such commentary as valid legal or medical advice (e.g., CDC[5], EEOC[6], etc.).

**126.** The defendant never provided notice of any kind to the plaintiff, advising the plaintiff as to the manner in which these medical treatments and medical inquiries were related to her essential job function.

**127.** In fact, one of the accommodations were related to the plaintiff's essential job function because she was able to continue performing her essential employment duties without participating in the defendant's "Covid-19 Policy".

---

[5] https://www.cdc.gov/other/disclaimer.html

[6] https://www.eeoc.gov/disclaimer

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 13 of 23

**128.** The plaintiff also alleged in her testimony and in written communications[7] that she was both willing and able to continue performing her employment duties and that the defendant's "Covid-19 Policy" was not related in any way to her essential job functions.

**129.** The plaintiff also alleges that the defendant failed to give conspicuous notice as to the manner in which such policies were related to the plaintiff's essential job functions.

## MEDICAL PRIVACY

**130.** Furthermore, the defendant's policy violates 29 CFR §1630.14(c) of the ADA because it involves sharing non-job-related medical classifications (e.g. "vaccination status", vital statistics and "PCR"[8] testing history) without any regard to confidentiality.

**131.** The policy includes no provision to preserve the medical privacy rights of any employee, including the plaintiff's.

**132.** The defendant's policy purportedly requires employees to examine themselves, and then make a self-diagnosis[9] upon which the defendant intends to rely as if such diagnosis was obtained by a licensed, qualified professional physician.

**133.** The defendant's policy does however require employees to obtain a physician's note if they are claiming some exemption to the policy for medical reasons.

**134.** The defendant's "Covid-19 Policy" also impairs the plaintiff's ability to perform her essential job functions by imposing mitigation measures which create a physical impairment that substantially limits the plaintiff's ability to engage in one or more major life activities, such as working, communicating with others, caring for oneself, breathing, etc.

**135.** The defendant refused to allow the plaintiff to continue working without first submitting to its discriminatory "Covid-19 Policy".

---

[7] A true and correct copy of which is alleged as Exhibit A.

[8] Polymerase Chain Reaction

[9]"Covid-19 testing" results does not verify a diagnosis of being infected with "Covid-19", the test it is designed to detect the presence of a coronavirus, of which there are many, including the common cold. The tests also give many false positives when they are were not set to correct cycling according to instructions.

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 14 of 23

## MEDICAL AND RELIGIOUS EXEMPTIONS

**136.** The plaintiff is not required to request exemptions from the defendant's "Covid-19 Policy" for religious or medical reasons because none of its provisions in the policy are related to her essential job function.

**137.** The plaintiff is not required to request any accommodations or reasonable modifications because the "Covid-19 Policy's" provisions are not related to her essential job function.

**138.** Therefore, the plaintiff had no duty to request any reasonable modification or accommodation to the defendant's "Covid-19 Policy"; however, the plaintiff was deceptively informed that she could request a "religious or medical exemption".

**139.** The "accommodations" of religious or medical exemptions fail to meet the statutory requirements of ADA compliant accommodations as defined in 29 CFR Part 1630.2 (o) because the "exemptions" offered are not job-related adjustments to the workplace environment.

**140.** The defendant's policy did not impose any new legal duties upon the plaintiff from which she could have been exempted or needed to request exemption from.

**141.** The defendant's deceptive practice was only intended to give the appearance of fairness while the defendant could deny or revoke exemptions as it suited.

**142.** The defendant never disclosed the qualifying criteria for such an "exemption" nor disclosed the legal duty from which the plaintiff was being "exempted".

**143.** The plaintiff is not required to discuss the nature of an un-assessed disability she is "assumed" to have; nor is she required to request any "reasonable modifications", for an un-assessed disability she is assumed to have.

**144.** The plaintiff was always protected under the ADA once she opposed the policy.

**145.** The plaintiff is not required to use the language of the ADA to claim this protection, however the plaintiff did specifically give notice to the defendant that she was a qualified individual who was being regarded as having a disability by the defendant's policy.

## ABSENCE OF AN INDIVIDUAL ASSESSMENT

**146.** The defendant failed to conduct any individualized assessment establishing that the plaintiff's good faith refusal to participate in its "Covid-19 Policy" was a direct threat.

**147.** The defendant simply punished the plaintiff for her refusal on the pure speculation that the plaintiff had a disability known as "Covid-19".

**148.** The defendant acted on pure speculation that someday the plaintiff might have such a disease.

**149.** The defendant acted on the false premise that the defendant had the legal duty and authority to protect the plaintiff and everyone else from contracting such a disease (disability).

**150.** The defendant claimed that the plaintiff had a deadly contagious disease, or that she might someday become infected with such a disease, is not a defense to violating the ADA, specifically, 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and 1630.14(b), (c) and (d).

**151.** The defendant cannot rely upon news or public announcements to determine that the plaintiff individually poses a direct threat because the statute requires a *bona fide* medical examination and diagnosis by a physician.

**152.** The "Covid-19 Policy" does not include a provision for requiring an individualized assessment by a physician to determine whether the employee poses a direct threat in the first place yet it requires employees to obtain a note from their physician in order to qualify for a "medical exemption" to the policy.

**153.** The defendant acted irrationally by regarding the plaintiff and others as having an illness without any diagnosis, then sought to treat everyone with the same medical intervention without any diagnosis. This behavior is defined as a mental illness in the Fifth Edition of the <u>Diagnostic and Statistical Manual for Mental Health</u>.[10] The "Covid-19 Policy" generates such irrational behavior from those seeking to impose that they act "as if" they are suffering from an un-diagnosed mental illness.

## RECORD OF A DISABILITY

**154.** The plaintiff is also entitled to the protections established in the ADA under the third prong which establishes coverage when others make a "record of" an individual's disability.

**155.** The defendant's "Covid-19 Policy" assumes that "unvaccinated" employees who do not have a medical or religious exemption are impaired by a contagious disease and simultaneously assume that they are impaired by a suppressed or weak immune system or respiratory system that makes them vulnerable to "Covid-19".

---

[10]Factitious Disorder or Munchhausen Syndrome by Proxy.

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 16 of 23

**156.** The defendant <u>made a record of the impairment its policy is intended to treat,</u> by documenting plaintiff's "vaccination status" (even though plaintiff refused to disclose her medical records) via its communication, attitude and treatment of the plaintiff.

**157.** The defendant mis-classified the plaintiff and made a record of impairment by imposing its policy upon the plaintiff without any diagnosis, but based upon pure speculation, generalization, and stereotype.

**158.** The defendant made a record of disability by classifying the plaintiff as an "unvaccinated" employee, and classifying her as needing to wear a mask and self-test which led to requiring her to submit to testing and to disclose her medical information despite the fact that her job was completely remote (work from home) and therefore did not go to defendant's premises nor interacted with other employees.

**159.** The defendant threatened to terminate the plaintiff if she did not comply with the requirements of its "Covid-19 Policy", and ultimately firing her, and thus causing plaintiff to suffer loss of income and employment opportunities.

**160.** The mitigation measures imposed by defendant's "Covid-19 Policy" also create physical impairments that substantially limit the plaintiff's ability to engage in one or more major life activities, including working, communicating and interacting with others.

**161.** The defendant, by its own policies, attitude toward the plaintiff, written communications, method of record-keeping and general treatment of the plaintiff, created a set of facts that satisfy the criteria under the ADA's "record of" disability prong.


### PROTECTION UNDER THE ADA

**162.** The defendant's "Covid-19 Policy" was not uniformly or universally applied to the plaintiff once the defendant began making a record of such disability by mis-classifying the plaintiff as having an impairment which needed to be treated or cured by the defendant's "Covid-19 Policy".

**163.** Upon refusing the defendant's offered mitigation measures or accommodations the plaintiff identified herself as being within a protected group.

**164.** Plaintiff was regarded as having a disability, upon claiming her rights to refuse the defendant's accommodations based upon her good faith opposition, she engaged in a protected activity.

**165.** The defendant applied the policy to everyone equally and failed to recognize that the plaintiff opposed the policy.

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 17 of 23

**166.** The defendant applied "Covid-19" policy to everyone equally and failed to recognize that the plaintiff gave notice of being regarded as having a disability.

**167.** The defendant applied the "Covid-19" policy to everyone equally and failed to recognize that the plaintiff objected to submitting to the defendant's "accommodations".

**168.** The defendant applied the "Covid-19" policy to everyone equally and failed to recognize that the plaintiff was within a protected class and engaged in a protected activity.

**169.** The plaintiff therefore was not subject to the same "Covid-19 Policy" as everyone else who had not invoked their rights under the ADA. As an analogy: consider a defendant requiring a wheelchair-bound employee to use the stairs or face loss of income, title or employment termination because *everyone is required to use the stairs and the policy is applied equally to everyone.* It is clear that this is an erroneous conclusion that does not allow disability rights.

## ABSENCE OF AN ADA EXEMPTION FOR EMPLOYER

**170.** Regarding each incident of the plaintiff's good faith refusal to accept defendant's "Covid-19 Policy" measures, and the defendant's adverse response, the plaintiff was in a protected class and engaged a protected activity and was not required to participate in the defendant's policy under 29 CFR Part 1630.9(d), unless the defendant established an exemption or exception to its legal duty to comply with the ADA.

**171.** The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have created any undue financial hardship.

**172.** The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have fundamentally altered their normal operations. In fact, the defendant's policy itself already did in fact fundamentally alter their normal operations.

**173.** The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

**174.** The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b).

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 18 of 23

**175.** The defendant failed to establish any set of facts that proved that its regarding the plaintiff as carrying the "Covid-19 disease" was transitory or minor.

**176.** If the disability is **both** transitory **and** minor, such as having the common cold, the defendant should establish the necessity of such a draconian policy.

**177.** There is no established end-date when the defendant would cease regarding the plaintiff in need of mitigation.

**178.** The defendant cannot now claim that such disability is "transitory", especially since it is not acting upon any medical diagnosis, court order obtained by the Department of Health, or any individualized assessment establishing that the plaintiff individually is a direct threat.

**179.** To this day, the defendant has failed to demonstrate that it met or satisfied any exemptions or exceptions to its *bona fide* legal duties under the ADA to aid and encourage those with disabilities, including the plaintiff.

**180.** The plaintiff's allegations easily satisfy the elements of discrimination by showing that she falls within a protected group, that she is qualified for the position she held, that she was subject to adverse employment actions and that the adverse employment actions were taken under circumstances which constitute unlawful discrimination.

**181.** The plaintiff demands a jury trial.

      **WHEREFORE** plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount the plaintiff is found to be entitled; (iv) reinstatement, or in the alternative front pay in the event reinstatement is not practical; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this Court.

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 19 of 23

## COUNT II. COMPLAINT FOR RETALIATION IN VIOLATION OF THE ADA

## AS AMENDED IN 2008

**182.**     The plaintiff sues the defendant for retaliation in violation of the ADA and the ADA-AA.

**183.**     The plaintiff re-alleges the foregoing statements of fact and allegations from her complaint for discrimination in Count I along with her affidavit, and further alleges the following.

**184.**     Upon giving defendant notice that she was regarded as having a disability and that she was a qualified individual with a disability, the defendant began retaliating against the plaintiff by imposing punitive measures and adverse employment actions, upon her for her good faith refusal to participate in the defendant's offered accommodations.

**185.**     The defendant's "Covid-19 Policy" depends solely upon getting the employee to voluntarily waive her rights to medical privacy and disclose such records through coercion and retaliation, any act by an employer designed to deter an employee from claiming their rights is an adverse employment action under the ADA and is prohibited by law.

**186.**     The defendant implemented a policy which regarded the plaintiff as disabled because of the plaintiff's unvaccinated status and when the plaintiff refused mitigation measures, the defendant responded with adverse employment actions.

**187.**     The defendant admits that refusing to disclose the plaintiff's "vaccination status" (i.e. medical records) would directly and causally result in the plaintiff's contract being either terminated or not renewed.

**188.**     Beginning from the moment she gave such notice to the defendant, the plaintiff suffered adverse employment actions[11] and the defendant continued attempting to impose its "Covid-19 Policy" upon the plaintiff.

**189.**     Defendant ignored and denied the plaintiff's claim of disability, reprimanded her, on a daily basis, for refusing its accommodations as alleged in the plaintiff's affidavit, and finally, terminated her employment as alleged in her affidavit.

**190.**     Title 29 of Part 1630.12(b) prohibits employers from retaliating against employees, namely the plaintiff for exercising and enjoying her rights under the ADA,  specifically, "[i]t is unlawful to coerce,

---

[11] Under the ADA, adverse employment actions include any actions taken which interfere the with the plaintiff claiming their rights, which deter plaintiff from claiming their rights or which punish or retaliate against the plaintiff for claiming their rights.

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 20 of 23

intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of, or because that individual aided or encouraged any other individual in the exercise of, any right granted or protected by this part."

**191.**   The defendant retaliated by seeking to impose its "Covid-19 Policy" upon the plaintiff in violation of its *bona fide* legal duty of care under the ADA.

**192.**   The defendant's "Covid-19 Policy" classified the plaintiff in such a way that her employment opportunities were adversely affected and limited because the defendant would not permit the plaintiff to do her job without first submitting to defendant's accommodations ("mitigation measures").

**193.**   The defendant proceeded to require the plaintiff to submit to "Covid-19" testing and to disclose her medical information despite the fact that her job was completely remote (working from home) in which she did not go to defendant's premises nor interacted with other employees.

**194.**   The defendant threaten to terminate the plaintiff if she did not comply with the requirements of its "Covid-19 Policy", and ultimately fired her, actions that causally resulted in the plaintiff's loss of assignment (job opportunities) and income.

**195.**   The plaintiff exercised her right to refuse the defendant's "Covid-19 Policy" measures based upon a good faith belief that the policy did not apply to her because of the foregoing alleged failure of the defendant to establish any exemption or exception to its legal duty to comply with the ADA.

**196.**   Exercising this right is a protected activity and the defendant's "Covid-19 Policy" was not equally or universally applied to the plaintiff because she had given notice of a disability and was therefore in a protected class and engaged in a protected activity.

**197.**   The plaintiff exercised her right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to her because the policy was not related in any way to her essential job function.

**198.**   The plaintiff exercised her right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to her because the defendant failed to give plaintiff conspicuous notice as the manner in which its policy was related in any way to her essential job function.

**199.**   The defendant imposed pecuniary measures and other adverse employment actions upon plaintiff which included the loss or threatened loss of pay, isolation, segregation, diminished employment responsibilities, interference with her rights as alleged in her affidavit.

**200.** Each time the plaintiff exercised her right to refuse the defendant's accommodations, she did so in good faith, and the defendant subsequently, in a manner that was causally-related to the exercise of such right, imposed adverse employment actions upon the plaintiff for no necessary reasons other than to deter her and punish her for exercising her rights.

**201.** The defendant imposed adverse employment actions upon the plaintiff which included, isolation and segregation, or sending her home so that she could not perform her essential job functions.

**202.** The defendant's "Covid-19 Policy", as alleged herein and described in more detail in the plaintiff's affidavit, describes a materially adverse change in the terms and conditions of employment, compared to the conditions of employment which existed prior to the defendant's implementation of it's "Covid-19 Policy".

**203.** These changes did not simply create an inconvenience for the plaintiff, they substantially altered the manner in which she was able to do her job and interact with co-workers by substantially impairing her ability to perform her essential employment duties.

**204.** The "Covid-19 Policy" is technically voluntary and yet the defendant imposed pecuniary measures and other adverse employment actions as a direct and proximate cause of the plaintiff's good faith refusal to participate or accept the provisions of the policy.

**205.** Each of the foregoing adverse employment actions resulted from every effort the defendant undertook to coerce the plaintiff into submitting to its "Covid-19 Policy" accommodations.

**206.** Each adverse employment action described herein was causally related to plaintiff's good faith refusal to comply with the defendant's policy.

**207.** Each adverse employment action took place within moments of, or in direct response to, plaintiff's expression of her good faith refusal to comply with the defendant's policy.

**208.** These facts demonstrate the defendant's adverse employment actions derived from the "Covid-19 Policy" and defendant' failure to comply with the ADA.

**209.** This constituted a materially adverse change in the terms and conditions of employment.

**210.** Before the "Covid-19" policy, the plaintiff and other employees were protected by disability law, medical privacy rights and the right to informed consent (which as explained previously are rooted in and protected by the ADA), the right to be heard, and the right to have a complaint for harassment heard impartially by the defendant, and after the defendant's adoption of its "Covid-19 Policy", all of those

rights were ignored and violated in a direct and causal response to the plaintiff's exercise of her right to refuse.

**211.** These changes were not just "disruptive" or inconvenient; they were not merely limited to include a change in plaintiff's employment duties. These changes included (actual or likely) termination of employment, isolation, demotion, decrease in wages and loss of benefits and were each causally-related to each time the plaintiff chose to exercise and enjoy her rights under the ADA.

**212.** Ultimately, the defendant did terminate the plaintiff's employment as a direct and proximate cause of her refusal to participate in the defendant's "Covid-19 Policy".

**213.** The plaintiff was engaged in the protected activity of refusing in good faith to participate in its "Covid-19 Policy".

**214.** The defendant was aware of plaintiff refusal from the very moment she expressed that she was regarded as having a disability and began refusing to participate in the policy.

**215.** Each time the defendant approached the plaintiff with a demand or request to submit to the terms of the "Covid-19 Policy", the defendant informed the plaintiff that she would be penalized, such as the plaintiff has previously alleged.

**216.** Each time the plaintiff exercised her right to refuse, the defendant undertook adverse employment actions against the plaintiff as previously alleged, and in each instance, such measures were causally related to the incident of refusing the policy and suffering penalties or pecuniary measures imposed by the defendant and each of these are detailed in the foregoing allegations.

**217.** The plaintiff demands a jury trial.

**WHEREFORE** plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount the plaintiff is found to be entitled; (iv) reinstatement, or in the alternative front pay in the event reinstatement is not practical; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

DATED this 18th day of October, 2022.

Patricia A. Ricci
Plaintiff in *propria persona*

Case 1:22-cv-00889-CCE-JEP   Document 1   Filed 10/19/22   Page 23 of 23